# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VERISK ANALYTICS, INC. and LENNY MERGER SUB, INC., | ) ) ) | |
| Plaintiffs/Counterclaim-Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. 2026-0023-BWD |
| EXACTLOGIX, INC., d/b/a ACCULYNX.COM, a Delaware corporation, and RICHARD SPANTON, JR., in his capacity as seller representative, | ) ) ) ) ) ) ) | |
| Defendants/Counterclaim-Plaintiffs. | ) ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: August 3, 2026
Date Decided: August 7, 2026

Michael A. Barlow & Judrick K. Fletcher, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, DE; OF COUNSEL: Dana M. Seshens, Brian M. Burnovski, James I. McClammy, Craig J. Bergman, Eric M. Kim, Rahul Krishnan, DAVIS POLK & WARDWELL LLP, New York, NY; Sascha Rand, K. McKenzie Anderson, Jonathan Feder, Morgan L. Anastasio; QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY; *Attorneys for Plaintiffs/Counterclaim-Defendants Verisk Analytics, Inc. and Lenny Merger Sub, Inc.*

William M. Lafferty, Kevin M. Coen, Benjamin S. Rothstein, Elaine M. McCabe, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; OF COUNSEL: Richard Marooney, Alvin Lee, Gary Adamson, Kenneth Fowler, Eric Hirsch, Briana Merritt, KING & SPALDING LLP, New York, NY; Lauren Myers & Germaine Habell, KING & SPALDING LLP, Los Angeles, CA; *Attorneys for Defendants/Counterclaim-Plaintiffs ExactLogix, Inc., d/b/a AccuLynx.com and Richard Spanton, Jr.*

**DAVID, V.C.**

This expedited post-trial decision resolves claims arising from Verisk Analytics, Inc.'s ("Verisk") decision to terminate a merger agreement to acquire AccuLynx.com, a cloud-based roofing business platform, for $2.35 billion in cash. The merger is subject to Federal Trade Commission ("FTC") approval under the Hart-Scott-Rodino Act ("HSR Act"). The merger agreement permits termination if the merger has not closed by the outside termination date, subject to exceptions that form the basis for the parties' arguments here.

AccuLynx and Verisk believed when they signed the merger agreement that the merger presented only minimal antitrust risk, as the companies did not compete horizontally or have a vertical supplier-customer relationship. Verisk's business includes "integrating" software with customers to support insurance claims estimation, but Verisk had integration agreements with only a small number of AccuLynx competitors.

Prior to the merger, Verisk was engaged in discussions with one such AccuLynx competitor, ServiceTitan, Inc., about developing an "enhanced" integration that would offer better pricing features than Verisk's standard integration. When Verisk agreed to the merger, it decided to end those discussions and negotiate a standard integration with ServiceTitan instead. Six days after the merger was announced, Verisk emailed ServiceTitan and told it that Verisk was

1

terminating discussions about the enhanced integration due to its merger with AccuLynx.

Soon after the FTC opened its preliminary investigation into the merger, ServiceTitan told the FTC about Verisk's decision to abandon the enhanced integration. That unusual decision prompted the FTC to develop a novel "market reset" theory of competitive harm centered on Verisk's plans to integrate with AccuLynx competitors. Simply put, the FTC posited that after the merger, Verisk might develop a new, more sophisticated pricing integration for AccuLynx that it would not offer to AccuLynx's competitors, thereby foreclosing AccuLynx competitors from effectively competing in the market for roofer business management software.

Over the following weeks, the FTC repeatedly asked Verisk in different ways whether it had ever terminated integration discussions with an AccuLynx competitor or rejected a request for an enhanced integration. Verisk did not realize that the FTC was specifically referring to ServiceTitan and repeatedly told the FTC that the answer was "no" when the FTC knew from ServiceTitan that the answer was "yes." Verisk's outside counsel eventually learned of Verisk's discussions with ServiceTitan and disclosed them to the FTC.

Thereafter, the FTC issued a "second request" focused on Verisk's integrations. Verisk undertook an extensive document search under a quick look

agreement in an effort to obviate the second request, but the FTC ultimately decided that it would require full compliance with the second request. Days after the FTC made that decision, Verisk purported to terminate the merger agreement on the extended termination date.

This decision concludes that Verisk's purported termination was invalid under the terms of the merger agreement, which forecloses termination if a terminating party is in material breach of the merger agreement or if its failure to comply with its covenants or "other willful conduct" has been the "primary cause" of the failure to satisfy a closing condition. AccuLynx argues, successfully, that Verisk's "willful conduct" was the primary cause of the second request, which prevented the HSR waiting period from expiring before the termination date. Because this decision concludes that Verisk's termination was invalid on that basis, it does not reach AccuLynx's alternative arguments that Verisk materially breached its obligations to use commercially reasonable efforts to take all actions to consummate the merger and to obtain an early termination of the HSR waiting period, or that such breach was the primary cause of the failure of a closing condition.

The Court thus finds that Verisk was not entitled to terminate and that AccuLynx is entitled to an order of specific performance requiring Verisk to perform under the merger agreement, including by using commercially reasonable efforts to

3

obtain clearance required under the HSR Act and to close the merger if the FTC approves the transaction.

## I.   BACKGROUND

The following facts are as the Court finds them following a four-day trial held June 23 through June 26, 2026.[1]

### A.   The Parties

Verisk is a Delaware corporation that provides software and data analytics products to participants in the global insurance industry.[2]  Verisk's suite of claims estimation tools and software is called "Xactware," which includes the "Xactimate" and "XactAnalysis" software products.[3]  Xactimate is used by insurance adjusters and contractors to estimate property damage after events like fires or storms, and XactAnalysis is used for claims analytics, performance benchmarking, and claims workflow management.[4]

---

[1] The Pre-Trial Stipulation and Order is cited as "PTO ¶ __".  Dkt. 222.  Trial testimony is cited as "Tr. (Witness) at __".  Dkts. 237–40.  Joint exhibits are cited as "JX __" unless otherwise defined.  *See* Dkt. 242.

[2] PTO ¶ 6.

[3] *Id.*

[4] *Id.*

ExactLogix, Inc., d/b/a AccuLynx.com ("AccuLynx") operates a cloud-based roofing business management platform that assists roofing contractors in making sales and overseeing customer relationship management ("CRM").[5]

## B. Verisk Explores An Enhanced Integration With ServiceTitan.

Verisk offers third parties the opportunity to "integrate" their software with the Xactware suite to support the claims estimation process.[6] Historically, Verisk has offered the same "standard" integration to all third parties.[7] In late 2024, however, ServiceTitan, an AccuLynx competitor, asked Verisk to develop "a deeper, more bespoke integration" that would be more robust than the integrations Verisk was offering to other parties.[8] Verisk and ServiceTitan began to explore a pricing integration that would grant ServiceTitan contractors access to Verisk's real-time pricing data when pricing out insurance estimates (an "Enhanced Integration").[9] At Verisk, the team responsible for this project included Verisk's Vice President of Product for Property Estimating Solutions, Jason Love; Love's direct supervisor and Verisk's Chief Product Officer for Property Estimating Solutions, David Obert; and

---

[5] *Id.* ¶ 8; JX 222 at 3.

[6] JX 325 at 7–8.

[7] Tr. (Love) at 254:7–17.

[8] *Id.* (Huang) at 477:2–16; *see id.* (Love) at 243:22–253:9 ("There was a lot of risk with this integration. We speculated that it could cannibalize our Xactimate license revenues. So we wanted to proceed cautiously with a proof of concept.").

[9] Tr. (Love) at 250:21–251:21, 254:18–21.

Obert's direct supervisor and Verisk's President of Property and Restoration Solutions, Aaron Brunko.[10]

As discussions progressed, Verisk and ServiceTitan did not align on the proposed scope of or pricing for the Enhanced Integration.[11] In May 2025, Verisk proposed that ServiceTitan users would pay approximately $20 per contractor estimate to access Verisk's pricing data and that its pricing data would be accessible to contractors using ServiceTitan's software.[12] In June, ServiceTitan offered $4 per estimate and counter-proposed that contractors would access the data with an Xactimate license.[13] In other words, "both the price and the requirement that the contractor ha[ve] an Xactimate license weren't aligned with [Verisk's] initial objectives."[14] By mid-2025, Verisk and ServiceTitan still had not reached agreement on the terms of an Enhanced Integration.[15]

---

[10] PTO ¶¶ 15–17; Tr. (Brunko) at 164:6–8, 168:6–22.

[11] Tr. (Love) at 256:6–13, 286:5–8.

[12] *Id.* at 285:22–286:1; JX 70 at 8.

[13] Tr. (Love) at 286:2–4; JX 70 at 8.

[14] Tr. (Love) at 256:21–24.

[15] *See* JX 70 at 9.

In early July, ServiceTitan asked Love if rumors that Verisk was acquiring AccuLynx were the reason the Enhanced Integration was "going slow."[16] Love shared ServiceTitan's concerns with Obert, who passed them along to Brunko.[17] Two weeks later, ServiceTitan asked again about reports of a Verisk-AccuLynx merger.[18] ServiceTitan explained that, "[g]iven the news of Accu[L]ynx[,] [ServiceTitan] want[ed] to ensure [Verisk] [was] not changing direction, and [an] onsite visit [then scheduled for August] w[ould] not be a waste of their time."[19] Love again shared ServiceTitan's comments with Obert, who asked Brunko "whether we should continue[,]" noting he "s[aw] the merit to both sides" and needed "guidance."[20]

Brunko raised Obert's question with Verisk's Head of Corporate Development and Strategy, Yang Chen, and its Chief Business Officer for Claims

---

[16] JX 983 at 1 ("Service Titan called today to ask me if their integration project with us was deliberately going slow because of an effort to acquire AccuLynx."); Tr. (Love) at 257:1–258:13.

[17] JX 983 at 1.

[18] JX 200 at 2 ("It sounds like the word on the street is the AccuLynx acquisition is [a] done deal. Dan Long is starting to get internal pushback on the investment they have planned this year for the Xactimate pricing integration if Verisk is going to pull the rug out from underneath them and not move forward with the project."); Tr. (Love) at 259:4–260:5.

[19] JX 200 at 2.

[20] *Id.*

Solutions, Helena Cornell.[21] Chen suggested that Verisk "wait to get back to"

ServiceTitan until after the merger announcement:

> Can we wait to get back to them until after we announce [the merger with AccuLynx] (they seem to imply they know, but it would be easier if it's definitely out in the open)? Then I would take a little time to compare what [AccuLynx] has vs[.] what [ServiceTitan] has, and think about different levels of integration (just pricing? Is there workflow integration as well?) . . . .[22]

Brunko agreed that Verisk would "pause on the new methods and capabilities and offer the baseline ecosystem play we offer to everyone. There may be reserved capability that we've already identified in the IC synergy case that is for [AccuLynx] only."[23]

### C.  Verisk And AccuLynx Enter Into The Merger Agreement.

On July 29, Verisk, Verisk's wholly owned subsidiary, Lenny Merger Sub, Inc. ("Lenny Sub"), AccuLynx, and Richard Spanton, Jr.,[24] as "Seller Representative," entered into a merger agreement (the "Merger Agreement") under which Verisk would acquire AccuLynx through Lenny Sub for $2.35 billion in cash

---

[21] JX 205 at 1–2; PTO ¶¶ 13–14.

[22] JX 205 at 1.

[23] *Id.*

[24] Spanton is AccuLynx's founder, majority owner, and chairman of its board of directors. PTO ¶ 9.

(the "Merger").[25]  The deal was publicly announced on July 30.[26]  Verisk closed on debt financing in August.[27]

## D.    Verisk Tells ServiceTitan It Is Terminating Discussions On An Enhanced Integration Due To The Merger.

Six days after the Merger was announced, on August 5, Love sent ServiceTitan an email (the "August 5 Termination Email") explaining:

> Now that the [AccuLynx] acquisition has been announced publicly, more information has been coming to [another colleague] and me. Considering this new information, we will not be able to continue down the path of placing Xactimate's pricing data directly into [ServiceTitan's] estimating solution.[28]

The August 5 Termination Email offered instead to move forward with a standard integration "with ServiceTitan using the workflows that are currently available to other Roofer and Contractor job management solutions."[29]  Verisk and ServiceTitan publicly announced a standard integration on September 17.[30]

---

[25] *Id.* ¶ 36; JX 212 [hereinafter Agt.] §§ 2.1(a)–(b).

[26] PTO ¶ 36; JX 237.

[27] Tr. (Mann) at 463:7–464:11; JX 291.

[28] JX 246 at 2.

[29] *Id.*

[30] JX 362.

## E.     The Terms Of The Merger Agreement

The Merger Agreement includes several provisions central to the current dispute. In Section 6.1(a), Verisk covenanted to use commercially reasonable efforts to take all actions necessary to consummate the Merger:

> General. [Verisk] shall use **commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the Transactions**.[31] Without limiting the generality of the foregoing, [Verisk] shall make all required filings with Governmental Entities, and use commercially reasonable efforts to obtain any Third Party consents required to consummate the Transactions. [Verisk] agrees to use commercially reasonable efforts to cooperate with [AccuLynx] in connection with the foregoing.[32]

The parties anticipated that the Merger would be subject to FTC approval under the HSR Act. In Section 6.1(b), Verisk covenanted to make filings required under the HSR Act, use commercially reasonable efforts to obtain an early termination of any applicable waiting period under the HSR Act, comply at the earliest reasonably practicable date with any request under the HSR Act, and use commercially reasonable efforts to promptly obtain any clearance required under the HSR Act:

---

[31] The Merger Agreement defines the "Transactions" to mean "this [Merger] Agreement . . . and the transactions contemplated hereby and thereby (including the Merger)." Agt. at 1.

[32] *Id.* § 6.1(a) (emphasis added).

10

Antitrust Laws.  [Verisk] shall (i) make any filings required of it or any of its Affiliates under the HSR Act and other antitrust Laws applicable to the Transactions by the HSR Filing Date (subject to extension in the event of a Government Closure as provided in Section 5.4(b)); (ii) **use commercially reasonable efforts to obtain an early termination of any applicable waiting period thereunder** and will promptly make any further filings pursuant thereto that may be necessary, proper or advisable in connection therewith; (iii) **comply at the earliest reasonably practicable date with any request under the HSR Act or other antitrust Laws for additional information**, documents or other materials received by it or any of its Affiliates from the FTC or any other Governmental Entity in respect of such filings or such transactions . . . .  [Verisk] shall use its (A) commercially reasonable efforts to furnish to [AccuLynx] all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Transactions and (B) **commercially reasonable efforts to promptly obtain any clearance required under the HSR Act** and any other antitrust Laws for the consummation of the Transactions . . . .[33]

In Sections 8.1(a) and 8.2(a), the parties agreed that the Merger would be subject to certain closing conditions, including that "[a]ny waiting period applicable to the Transactions under the HSR Act shall have expired or been terminated."[34]

Section 9.1 governs termination of the Merger Agreement.  The parties agreed on a timeline of four to five months to close the Merger, consistent with their expectation at the time of signing that the Merger would not attract antitrust

---

[33] *Id.* § 6.1(b) (emphasis added).  AccuLynx similarly covenanted to use commercially reasonable efforts toward closing in Section 5.4 of the Merger Agreement.  *Id.* § 5.4.

[34] *Id.* §§ 8.1(a), 8.2(a).

scrutiny.[35]   The Merger Agreement set an initial outside closing date (the "Termination Date") of November 26, with an option for either party to extend the Termination Date one time, to December 26.[36]

Although the Merger Agreement does not automatically terminate, either party may terminate after the Termination Date.  However, Section 9.1 further provides that Verisk may not terminate the Merger Agreement if Verisk's "knowing and willful breach of this Agreement has prevented the satisfaction of the conditions to the consummation of the Transactions":

> Termination.  This Agreement may be terminated at any time prior to the commencement of the Closing: . . . (f) by [Verisk], if the Transactions have not been consummated on or before November 26, 2025 (the "Termination Date"); provided that **[Verisk] shall not be entitled to terminate this Agreement pursuant to this Section 9.1(f) if a Buyer Party's knowing and willful breach[37] of this Agreement has prevented the satisfaction of the conditions to the consummation of the Transactions** set forth in Section 8.2 . . . .[38]

---

[35] Tr. (Asker) at 13:11–14:12 ("So all of these facts, all of these conclusions were encouraging that there would not be significant antitrust issues arising from the deal."); *see id.* at 16:1–6 ("My understanding is that AccuLynx had proposed a 90-day outside date. Verisk had come back with a six-month outside date proposal.  In the course of negotiating that term and many others, the parties agreed to this four-months plus one-month term which is reflected in the final agreement.").

[36] Agt. § 9.1(f).

[37] The Merger Agreement defines "Willful Breach" to mean "an intentional and willful material breach, or failure to perform any covenant or obligation, of this Agreement that is a consequence of an act or omission knowingly undertaken or omitted by the breaching party hereto with the intent of causing a breach of this Agreement[.]" *Id.* § 9.2.

[38] *Id.* § 9.1(f).

The final sentence of Section 9.1 further provides that neither party may terminate in two additional circumstances:

> Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under Section 9.1 shall not be available to a party (a) **if such party is then in material breach of its obligations hereunder** or (b) **if such party's failure to fulfill its obligations or to comply with its covenants under this Agreement, or other willful conduct, has been the primary cause of, or primarily resulted in, the failure to satisfy any condition** to the obligations of the Parties hereunder.[39]

### F.    The Parties Submit HSR Filings To The FTC.

On August 19, Verisk and AccuLynx submitted initial Merger filings with the FTC as mandated by the HSR Act, triggering a 30-day waiting period before the Merger could close.[40]

On August 26, Ashley Masters, a staff attorney with the FTC, informed the parties that the FTC had opened a preliminary investigation into the Merger.[41] Two days later, the FTC sent Verisk an initial set of questions concerning Verisk's position in the claims software market and AccuLynx's products.[42] With the understanding that the FTC had just 30 days to decide whether to issue a "second

---

[39] *Id.* § 9.1 (emphasis added).

[40] PTO ¶ 48. Around this time, postings appeared on the internet criticizing the Merger as anticompetitive. *See, e.g.*, JX 251; JX 263.

[41] PTO ¶ 49; Tr. (Asker) at 18:18–19:1; *id.* (Antoine) at 632:21–633:3.

[42] Tr. (Asker) at 20:5–20; JX 296–297.

13

request"—a formal, in-depth demand for additional information that could take many months to complete[43]—the parties provided a joint response to the FTC within a few days, on September 1.[44]

### G. The FTC Speaks With AccuLynx Competitors, Including ServiceTitan, Prompting A "Market Reset" Theory Of Competitive Harm.

As the FTC communicated with Verisk and AccuLynx, it also began reaching out to market participants to discuss the deal. In September, the FTC contacted Verisk competitor Cotality and AccuLynx competitors ServiceTitan, Roofr, JobNimbus, and RoofLink.[45]

On September 5, the FTC held a meeting with the parties, during which Brunko presented on Verisk's claims estimation business.[46] Unbeknownst to Verisk, the very same day, ServiceTitan's General Counsel, Olive Huang, told Masters on a phone call that prior to the Merger, Verisk and ServiceTitan were negotiating an Enhanced Integration, but after the announcement of the Merger, Verisk had "changed their minds" and ended the discussions.[47]

---

[43] Tr. (Antoine) at 656:8–11, 658:16–659:11.

[44] JX 308; Tr. (Asker) at 20:21–21:6.

[45] JX 250; JX 304; JX 316; JX 348; JX 606.

[46] Tr. (Asker) at 21:18–22:11; *see* JX 326.

[47] Tr. (Huang) at 481:11–482:2 ("So we did say that we had been pursuing a more bespoke integration with Verisk and they changed their minds on pursuing that bespoke integration after the transaction was announced.").

14

Three days later, the FTC sent the parties additional questions focused on Xactware's "pricing model for third-party integrations" and how "pricing for the integration may differ by type of integrator or function."[48] Among its questions, the FTC asked how "potential integration of [AccuLynx] with Xactware post-merger" would "differ, if at all, from any current or planned . . . integrations Xactware has with companies that Verisk or AccuLynx has identified as rivals to AccuLynx."[49] In its questions, the FTC specifically referenced "existing integrations of XactAnalysis with [Salesforce] and JobNimbus and planned integrations of Xactimate with Roofr and ServiceTitan."[50]

While the parties were preparing responses to these integration questions, they met again with the FTC on September 10 and 11. The FTC explained that it was exploring four theories of competitive harm:

> [T]he first two were . . . horizontal antitrust concerns. [Masters] was continuing to evaluate with her colleagues whether any Verisk tools might be competitive with AccuLynx. There was a particular product she had in mind that generated about $3.5 million a year in revenue from Verisk that she was continuing to evaluate whether it might be used in similar ways to AccuLynx. So that was her first concern.
>
> The second was whether Verisk might develop a tool in the future that was competitive with AccuLynx such that there might be a loss of

---

[48] JX 331 at 3.

[49] *Id.*

[50] *Id.*

potential future competition between the companies, even if they did not compete today.

The third and fourth issues were . . . vertical antitrust issues. Issue three, as [Masters] articulated it, was whether by combining these two independent companies into one, incentives of the combined enterprise might change such that it might become harder for competitors of Verisk to integrate with or partner with AccuLynx than it was prior to the merger.

. . .

The fourth issue [wa]s whether as a result of the deal, Verisk's incentives to integrate Xactimate with competitors of AccuLynx . . . might change and there might be an incentive to withhold integration or degrade integration. And if that was the case, . . . the ultimate question was would that result in a harm to competition to customers in the marketplace.[51]

At the meetings, the FTC told Verisk's counsel that it "had not completed its investigation [and] continued to have questions."[52] According to Nathaniel Asker, a partner at Davis Polk & Wardwell LLP ("Davis Polk") and Verisk's principal antitrust counsel,[53] "[Masters] said that she was facing deadlines on her end, and unless something changed, she would need to shift her attention and resources to preparing a recommendation to issue a second request."[54] The FTC explained to Olivier Antoine, a partner at King & Spalding LLP who served as AccuLynx's

---

[51] Tr. (Asker) at 26:1–2, 28:8–30:12; *see* JX 342.

[52] Tr. (Asker) at 26:5–9.

[53] PTO ¶ 20.

[54] Tr. (Asker) at 26:12–15.

16

principal antitrust counsel,[55] that it was "hearing concerns" and was "at a stage where we need to investigate further before we can say that any questions are resolved."[56] Jason Osborn, a partner at King & Spalding and AccuLynx's principal M&A counsel,[57] was left with the "impression" that the FTC "want[ed] to block [the deal] by blowing up [the] outside date."[58]

At this point, Verisk and AccuLynx jointly engaged economists at Econic Partners, LLC ("Econic") to help advocate to the FTC.[59]

### H. Verisk Fails To Identify Enhanced Integration Discussions With ServiceTitan In Response To FTC Inquiries.

On September 12, the FTC sent Verisk another set of five questions, which included a request to "[i]dentify all integrations with Xactimate, XactAnalysis, XactRemodel, or Restoration Manager terminated or changed to inactive status since 2015."[60]

Just a few days later, Masters held another call with ServiceTitan to further discuss the Enhanced Integration that ServiceTitan had been exploring with Verisk

---

[55] PTO ¶ 21.

[56] JX 342 at 1.

[57] PTO ¶ 21.

[58] JX 342 at 3.

[59] PTO ¶ 22.

[60] JX 374 at 2.

17

prior to the Merger announcement.[61]  During the call, Huang conveyed to Masters the content of the August 5 Termination Email in which Love told ServiceTitan that "[n]ow that the [AccuLynx] acquisition has been announced publicly," Verisk would "not be able to continue down the path of placing Xactimate's pricing data directly into ServiceTitan's estimating solution."[62]

On September 22, Verisk responded to the FTC's September 12 questions.[63] At this point, the FTC knew about Verisk's August 5 Termination Email to ServiceTitan.  But in response to the FTC's question concerning "terminated or changed" integrations, Verisk responded that it "has rarely terminated integration of Xactimate, XactAnalysis, XactRemodel, or Restoration Manager, and in the few instances in which an integration has been terminated, that has been due to low adoption from integration partner customers, integration partners choosing to cancel services, or an inability for integration partners to meet Verisk's data security requirements."[64]  Verisk's response did not identify its discussions with ServiceTitan about an Enhanced Integration.

---

[61] *See* Tr. (Huang) at 484:2–486:23; JX 350 at 1.

[62] Tr. (Huang) at 484:21–486:9.

[63] JX 374.

[64] *Id.* at 5–6.

## I. The FTC More Fully Articulates Its "Market Reset" Theory.

On September 22, Verisk withdrew and refiled the HSR filings, restarting the HSR waiting period to give the FTC an additional 30 days, until October 22, to clear the deal without issuing a second request.[65]

On September 26, the parties had another call with the FTC.[66] On that call, the FTC explained that it had narrowed its focus to exploring a "market reset" theory of harm, which centered on Verisk's integrations with AccuLynx competitors after the Merger.[67] The FTC posited that after the Merger, Verisk might develop a new, more sophisticated pricing integration for AccuLynx that it would not offer to AccuLynx's competitors, thereby foreclosing AccuLynx competitors from effectively competing in the market for roofer business management software.[68] The FTC knew that Verisk had previously rejected a request from an AccuLynx competitor for an enhanced integration because it was aware of the August 5 Termination Email. But once again, Verisk did not identify its discussions with ServiceTitan about an Enhanced Integration and disclosed only that ServiceTitan had announced a new integration with Xactimate on September 17.[69]

---

[65] PTO ¶ 50; Tr. (Asker) at 27:3–21.

[66] Tr. (Asker) at 35:19–21.

[67] *Id.* at 35:19–36:21; JX 405 at 2.

[68] JX 405 at 2.

[69] *Id.* at 6.

The parties prepared and submitted a response to the FTC on September 30, in which they argued that "[e]mpirical evidence does not support" a "market reset" theory.[70]

## J.  Amidst A Government Shutdown, The FTC Continues To Press Verisk About Its Integrations.

The federal government shut down on October 1, but the parties continued to engage with the FTC.[71]  On October 3, FTC staff relayed that it was "hearing from several sources in the marketplace a consistent message that" "any integration that Verisk does with AccuLynx's competitors would not be at the level or utility which would be achievable with the merger."[72]  The FTC told the parties that it had "absorbed the data and advocacy provided, as best [it] c[ould] with the shutdown," but that "even if [the FTC] accept[ed] all the facts presented as true, it d[id] not answer the concerns that post-merger Verisk w[ould] have different incentives and an ability to harm AccuLynx's competitors."[73]  The FTC also told the parties it heard "that Verisk [wa]s able to not facilitate or not meaningfully facilitate integrations

---

[70] *Id.* at 2.

[71] Tr. (Asker) at 38:10–22.

[72] JX 412 at 1 (citation omitted).

[73] *Id.*

today; today's integrations are not on the level that future integration that Verisk and AccuLynx will be."[74]  The FTC heard this from ServiceTitan.

On October 7, Masters told the parties that she was "[h]aving a hard time reconciling . . . how [the information Verisk had provided] responds to concerns about the other sides of the market" and, thus, the FTC was "likely to have substantial questions."[75]  Masters was transparent that the FTC would "[m]ore likely than not" issue a second request.[76]  At the same time, FTC Deputy Assistant Director Jessica Drake echoed that the "[n]ature of [the FTC's] concerns" meant that "there are some questions you simply can't answer for us."[77]  Drake and Masters explained that the likelihood of a second request was "driven by the concerns" that the Merger would "create a barrier to entry to competition for others in the market."[78]

The same day, Masters asked ServiceTitan for a copy of Verisk's August 5 Termination Email.[79]

---

[74] JX 421 at 3.

[75] JX 437 at 2 (citation omitted).

[76] *Id.* at 3.

[77] *Id.*

[78] *Id.* at 3–4.

[79] Tr. (Huang) at 488:7–17, 489:6–13.

**K. The FTC Asks If Verisk Has Ever Rejected A Request For An Integration, And Verisk Conducts A Document Search.**

On October 9, the parties sent a letter to the Director of the Bureau of Competition, Daniel Guarnera, asking for a meeting to convince the FTC to close its investigation without issuing a second request.[80]

The parties also requested another meeting with Masters and Drake to "discuss [the] market reset theory" and address questions "raised about synergies and deal rationale."[81] That meeting occurred on October 14.[82]

During the October 14 meeting, the FTC asked three times in three different ways "whether any competitors of AccuLynx had approached Verisk to request an integration with Xactware that is more sophisticated or materially different than the integration that is currently available with JobNimbus, and whether Verisk ha[d] rejected such offer."[83] The FTC already knew the answer to that question was "yes" because, again, the FTC knew about the August 5 Termination Email. However, Brunko told the FTC "he could not recall" if that had ever occurred, and Verisk

---

[80] JX 453 at 3.

[81] Tr. (Asker) at 48:15–49:13.

[82] *See* JX 487 at 1.

[83] JX 511 at 2; JX 641 at 1–2; Tr. (Asker) at 144:4–18; *see id.* at 57:15–58:2.

committed to "go back" and "check [its] record[s]."[84]  The FTC asked Verisk to follow up with an answer to this question in writing.[85]

At trial, Brunko testified that he did not tell the FTC about Verisk's decision to terminate discussions with ServiceTitan in August because he did not realize those discussions were responsive to the FTC's question, since he viewed Verisk's standard integration with ServiceTitan as a success:

> [W]e had a great conversation [with ServiceTitan during a meeting]. We figured out an integration plan, a path that would work for them, and we executed an agreement and then promoted that through press. And for all indications, ServiceTitan was happy and we had moved past it.  So from my point of view, it was done.  It was in the rearview mirror.
> . . .
> I was focused on where have we rejected an ecosystem partner where we chose to not integrate with them.  And so when you look at ServiceTitan, I thought about that through the context of it was a successful integration agreement and we were progressing that forward. So I wasn't thinking about ServiceTitan at the time.[86]

Chen, who was present at the October 14 meeting, also failed to identify Verisk's discussions with ServiceTitan over an Enhanced Integration.  Chen testified that she "had no recollection" of the exchange that prompted the August 5 Termination

[84] Tr. (Asker) at 53:13–55:9, 56:24–57:14; *id.* (Chen) at 368:2–11; *id.* (Antoine) at 664:2–11.

[85] JX 641 at 2.

[86] Tr. (Brunko) at 223:5–17, 224:2–8.

23

Email, explaining that "this email topic [wa]s not [her] responsibility" and "[s]o . . . [she] just did not retain it in [her] mind."[87]

Immediately after the October 14 meeting, Masters contacted ServiceTitan again to ask for a copy of the August 5 Termination Email.[88]

Verisk, for its part, met with advisors to make a response plan and identify "a set of data that would be collected."[89] With the October 22 waiting period deadline looming, Verisk and AccuLynx agreed that "speed was important"[90] and Verisk should get back to the FTC within days.[91]

Verisk decided that rather than undertake a comprehensive email search, it would be more effective to conduct a targeted review through an internal database called "Jira" that stored "integration-related tickets or requests."[92] Brunko directed Love to run searches through Jira to identify "development work for ecosystem partners that had been completed, was in progress, on the roadmap, or had not been completed or wouldn't be completed."[93] In turn, Love asked his team "to scour Jira,

---

[87] *Id.* (Chen) at 369:17–24; *id.* at 370:6–16.

[88] JX 493 at 2; Tr. (Huang) at 489:14–492:2.

[89] Tr. (Asker) at 59:1–13.

[90] *Id.* (Antoine) at 665:16–666:11.

[91] *Id.* (Asker) at 61:18–62:18.

[92] *Id.* at 59:14–60:3; *see also id.* (Brunko) at 183:15–184:16.

[93] *Id.* (Love) at 267:23–268:18.

24

their emails, [and] their recollections of conversations" to "build a list of development work that fell into" the categories Brunko identified.[94] Love's team prepared a spreadsheet compiling hundreds of development requests, including several identified as "Rejected."[95]

Brunko then supplemented that search by building a "Python script" using generative AI to search Jira for references to AccuLynx competitors.[96] Brunko provided the results of his search to Verisk's counsel and Econic, who followed up with questions.[97] Love manually opened each ticket identified through Brunko's search and prepared a summary,[98] which noted that Verisk "ha[d] an active agreement in place" with ServiceTitan that was being "buil[t] out."[99] The summary did not identify Verisk's terminated discussions concerning an Enhanced Integration. According to Love and Brunko, it never occurred to them while running these searches that the FTC might be looking for that information, since, again, they viewed ServiceTitan as a "successful integration" and "a win" they "were still

---

[94] *Id.* at 268:19–270:15.

[95] *Id.* at 270:16–273:13; JX 984 at 10–12; JX 492.

[96] Tr. (Brunko) at 187:7–189:19.

[97] *Id.* at 189:20–190:3, 196:18–197:20; *id.* (Asker) at 61:4–12.

[98] *Id.* (Brunko) at 201:1–22; *id.* (Love) at 273:16–274:13; JX 513.

[99] Tr. (Love) at 275:23–276:12; JX 513 at 4.

celebrating."[100]  Love explained he did not consider ServiceTitan's development request as "rejected" because "[t]here wasn't development work that was needed," "[j]ust configuration and setup for the [standard integration]."[101]

On October 16, Verisk submitted a letter response to the FTC.  Its letter explained that Verisk had "reviewed ordinary course data from January 1, 2023 to October 14, 2025 maintained in Xactware's Jira database, . . . for orders relating to current or potential new integrations involving any of the 30 competitors identified in the AccuLynx win/loss data previously provided to the FTC."[102]  The letter stated that based on this review, Verisk "found no evidence that Verisk ha[d] declined to pursue an integration requested by a competitor of AccuLynx."[103]  The letter noted that "three AccuLynx competitors"—ServiceTitan, Roofr and CompanyCam—had "engaged with Verisk regarding potential new integration with Xactware or changes/implementation of existing integrations," but "there [we]re no instances in which Verisk declined to pursue an integration requested by the third-party."[104]  The letter explained that the data instead "showed that in the last decade, fewer than 10

---

[100] Tr. (Love) at 276:13–276:22; *id.* (Brunko) at 223:1–224:8.

[101] *Id.* (Love) at 276:23–277:4.

[102] JX 504 at 1.

[103] *Id.*

[104] *Id.* at 1–2.

26

third party integrations were deactivated," reflecting "Verisk's ongoing strategy of supporting meaningful integrations with third-parties."[105] And the letter further asserted that "[i]n the limited instances where Xactware does not support an integration or particular integration feature, this is generally due to technical limitation (often on the partner's end), data security concerns, or a commercial determination that costs of supporting an integration or feature outweigh the potential revenue opportunity."[106]

## L. The FTC Issues A Second Request But Agrees To A Quick Look Agreement.

On October 21, the parties' counsel met with the FTC's Bureau of Competition leadership.[107] The FTC told the parties "they hadn't yet [decided] whether to issue a second request" but said they would be open to a "quick look" agreement, a practice in which the FTC asks parties to prioritize certain information in a second request with the hope that upon receipt of the narrower data set, the FTC might clear the transaction without full compliance with the second request.[108]

At the October 21 meeting, the Principal Deputy Director of the Bureau of Competition, David Shaw, asked Verisk "what he said was a hypothetical," namely,

---

[105] *Id.* at 2.

[106] *Id.*

[107] Tr. (Asker) at 69:10–71:9.

[108] *Id.* (Asker) at 71:10–14, 73:8–74:1.

27

"how should the FTC think about a fact pattern where a potential integration was being considered prior to the merger. If Verisk made a decision not to pursue that integration as a result of the merger, how as a matter of antitrust law should that be evaluated from [the FTC's] perspective[?]"[109] This was not a hypothetical—Shaw was referring to ServiceTitan and the August 5 Termination Email.

The next day, FTC Chairman Andrew Ferguson told AccuLynx's lobbyist, James Burnham, that the FTC "believe[d] there [we]re significant concerns to explore here: [] both customers and competitors [we]re telling the FTC that . . . Verisk will use Xactimate to foreclose competition from AccuLynx's competitors."[110] "The concerns [we]re about Verisk's plans post transaction: a competitor told [the] FTC that they were about to integrate Xactimate with Verisk pre-transaction, and Verisk cut the discussions because of this deal."[111] That competitor was, of course, ServiceTitan.

---

[109] *Id.* at 71:18–72:2.

[110] JX 538 at 2.

[111] *Id.*

That day, the FTC sent a second request (the "Second Request") seeking additional information and documents from the parties.[112] The day after, the parties began to negotiate the scope of a quick look agreement with the FTC.[113]

### M. Verisk's Counsel Discovers Emails Concerning An Enhanced Integration With ServiceTitan And Produces Them To The FTC.

On October 30, while culling through emails to respond to the Second Request, Verisk's outside counsel at Davis Polk discovered emails from July and August discussing an Enhanced Integration with ServiceTitan.[114] Davis Polk immediately recognized that these emails were responsive to the FTC's earlier requests. Davis Polk notified AccuLynx's counsel at King & Spalding of its discovery, and the parties scheduled a call with Masters.[115] On the morning of November 4, Davis Polk, with King & Spalding on the line, told Masters that Davis Polk had identified correspondence between Verisk and ServiceTitan that was responsive to the FTC's repeated questions about terminated integrations.[116]

---

[112] PTO ¶ 51; Tr. (Asker) at 74:17–19.

[113] JX 568 at 9–10.

[114] Tr. (Asker) at 79:12–80:13.

[115] *Id.* at 80:14–81:22; JX 650 at 3.

[116] Tr. (Asker) at 82:2–83:2; *see* JX 650 at 2.

Later that day, the parties and the FTC executed the quick look agreement, under which Verisk and AccuLynx agreed to provide a narrowed scope of information in an effort to obviate the Second Request.[117]

Davis Polk sent Masters an email memorializing their November 4 call. Masters responded "to memorialize the additional discussion we had on yesterday's call regarding Mr. Brunko's failure to disclose the potential ServiceTitan integration with Xactimate pricing data in the October 14 meeting with FTC staff, the context for this nondisclosure, and the omission of that integration in [Verisk's] October 16 submission."[118] Masters reminded Davis Polk that "[i]n the October 14 meeting, while discussing integrations with roofing CRMs, staff asked three times if any AccuLynx competitor had asked Verisk for a more robust or materially different integration than the standard, existing integrations in place today," and "Mr. Brunko responded that he did not know of 'unique' discussions with other competitors and that Verisk would have to look through its documents to confirm."[119] "Staff affirmatively requested that Verisk answer this question in follow-up," and "Verisk provided a follow-up submission on October 16 with discussion of a 'recently

_____

[117] PTO ¶ 54.

[118] JX 650 at 2.

[119] *Id.*

30

announced[] new integration' with ServiceTitan[,]" but "did not disclose discussions with ServiceTitan regarding any integration with Xactimate pricing data."[120]

Within days, the FTC issued a subpoena to ServiceTitan.[121] Meanwhile, Masters sent another email to Davis Polk pointing out that "in addition to Mr. Brunko, Ms. Chen, who was also present at the staff meeting on October 14, had direct knowledge of the proposed ServiceTitan pricing integration that was not disclosed at that meeting nor in [Verisk's] follow up correspondence of October 16."[122]

On November 13, Verisk engaged Miller Strategies, a government affairs firm, to advocate for deal clearance.[123] Four days later, AccuLynx and Verisk certified compliance with the quick look review.[124] Within the span of eight weeks, Verisk collected nearly four million documents from 16 custodians, produced more than 400,000 responsive documents, and submitted a single-spaced, 36-page response to the FTC's first-phase specifications.[125]

---

[120] *Id.*

[121] JX 35.

[122] JX 650 at 1.

[123] PTO ¶ 29.

[124] *Id.* ¶ 55.

[125] Tr. (Asker) at 97:21–99:20; JX 670; *see* JX 843 at 80–84.

On November 21, Verisk elected under Section 9.1(f) of the Merger Agreement to extend the Termination Date from November 26 to December 26.[126]

**N.    The FTC Informs The Parties That It Will Require Full Compliance With The Second Request.**

On December 1, the FTC notified the parties that it expected to require full compliance with the Second Request.[127]  Verisk, AccuLynx, and their advisors participated in a flurry of calls and meetings throughout December in an effort to change the FTC's mind.[128]

On December 5, Verisk's Chief Executive Officer ("CEO"), Lee Shavel, provided an update to Verisk's board of directors, explaining that the FTC had told the parties that its decision to require full compliance with the Second Request was "based on concerns expressed by other market participants on the impact of the transaction."[129]

On December 11, the parties jointly submitted a single-spaced, 25-page white paper to the FTC in support of the Merger, requesting that the FTC conclude its

---

[126] PTO ¶ 56.

[127] Tr. (Asker) at 102:1–103:5.

[128] *See, e.g.*, JX 745; Tr. (Asker) at 108:16–109:24; *see also* JX 843 at 18, 33–35.

[129] JX 709; Tr. (Shavel) at 331:6–332:8.

review.[130]  Several days later, the parties met in person with FTC staff and Bureau of Competition leadership in further efforts to obtain FTC clearance of the Merger.[131]

In total, Verisk met with the FTC nearly 30 times during the Merger review process[132] and spent $6 million on outside counsel, plus nearly $2 million in document vendor fees for nearly 350 document reviewers to respond under the quick look agreement.[133]  Despite those efforts, on December 24, the FTC informed the parties of its final decision not to approve the Merger based on the quick look review and to instead require full compliance with the Second Request.[134]

## O.    Verisk Terminates The Merger Agreement.

On December 26, Verisk and Lenny Sub delivered a written notice to AccuLynx and Spanton purporting to terminate the Merger Agreement.[135] AccuLynx and Spanton disputed the validity of Verisk's purported termination.[136]

After Verisk's termination, AccuLynx's financial advisor, William Blair & Company ("William Blair"), spoke with a prospective buyer about a "revised

---

[130] PTO ¶ 57; JX 724.

[131] PTO ¶ 58.

[132] *See* JX 843 at 18–36.

[133] JX 90; JX 572; JX 690; JX 804.

[134] PTO ¶ 60.

[135] *Id.* ¶ 61; JX 782.

[136] PTO ¶ 61.

valuation and signing within 2 weeks."[137] William Blair continued similar discussions into early 2026.[138] In total, AccuLynx or its advisors engaged with at least ten potential buyers, resulting in three formal indications of interest.[139]

### P. Procedural History

On January 7, 2026, Verisk initiated this action through the filing of a Verified Complaint for Declaratory Judgment (the "Complaint"), seeking a declaration that its termination of the Merger Agreement was valid and effective.[140]

On January 21, AccuLynx answered the Complaint and asserted counterclaims seeking an order of specific performance.[141] The next day, AccuLynx filed a motion for expedited proceedings.[142] The Court ordered expedition on January 30.[143]

---

[137] *Id.* ¶ 27; JX 793 at 2.

[138] *See, e.g.*, JX 813; JX 825.

[139] *See* JX 892 at 2–7; JX 934; Tr. (Spanton) at 901:20–902:18; *see also* JX 815.

[140] Verified Compl. for Declaratory J., Dkt. 1.

[141] Verified Answer and Defenses to Verified Compl., and Defs.' Verified Countercls. [hereinafter Countercls.], Dkt. 4.

[142] Defs./Countercl.-Pls.' Mot. to Expedite Proceedings, Dkt. 6.

[143] Dkt. 28. On April 17, AccuLynx filed amended counterclaims. Defs./Countercl.-Pls.' Am. Verified Countercls., Dkt. 121.

34

The Court held a four-day expedited trial from June 23 through June 26.[144] The parties completed post-trial briefing on July 28.[145] The Court heard post-trial oral argument on August 3.[146]

## II.   ANALYSIS

Verisk seeks a declaration that it validly terminated the Merger Agreement. AccuLynx argues that the termination is invalid and seeks an order of specific performance requiring Verisk to comply with its obligations under the Merger Agreement, including to use commercially reasonable efforts to obtain clearance required under the HSR Act and to close the Merger "if and when" the FTC approves the transaction. Alternatively, AccuLynx seeks an award of damages for Verisk's breaches of the Merger Agreement.

Verisk "bears the burden of 'proving by a preponderance of the evidence the facts supporting the exercise of its termination rights.'" *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at \*16 (Del. Ch. Dec. 18, 2019) (quoting *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at \*4 (Del. Ch. Oct. 1, 2018),

---

[144] Dkt. 241.

[145] Defs./Countercl.-Pls.' Opening Post-Trial Br. [hereinafter OB], Dkt. 248; Pls. and Countercl.-Defs. Verisk Analytics, Inc. and Lenny Merger Sub, Inc.'s Post-Trial Br. [hereinafter AB], Dkt. 250; Defs./Countercl.-Pls.' Post-Trial Reply Br. [hereinafter RB], Dkt. 252.

[146] Dkt. 254. The August 3, 2026 post-trial oral argument is cited as "Oral Arg. Tr."

*aff'd*, 198 A.3d 724 (Del. 2018) (TABLE)). AccuLynx "b[ears] the burden of proving by a preponderance of the evidence the facts necessary to establish its claim that [Verisk] could not exercise those rights because [Verisk] was in material breach of its own obligations." *Akorn*, 2018 WL 4719347, at *4. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002).

The following legal analysis relies on principles of contract interpretation. "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021). "Contracts will be interpreted to 'give each provision and term effect' and not render any terms 'meaningless or illusory.'" *Id.* (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

## A. Verisk's Termination Was Invalid Under The Merger Agreement.

Verisk seeks a declaration that it validly terminated the Merger Agreement on the extended Termination Date. Although the Merger Agreement does not automatically terminate on the Termination Date, Section 9.1 permits Verisk to

36

terminate if the Merger is not "consummated on or before" the Termination Date, subject to three exceptions.[147] Under Section 9.1(f), Verisk is not "entitled to terminate . . . if [its] knowing and willful breach of this Agreement has prevented the satisfaction of the conditions to the consummation of the Transactions."[148] In addition, the final sentence in Section 9.1 provides that neither party may terminate:

> (a) if such party is then in material breach of its obligations hereunder or
>
> (b) if such party's failure to fulfill its obligations or to comply with its covenants under this Agreement, or other willful conduct, has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of the Parties hereunder.[149]

The facts of this case stand apart from other broken deal cases in which a buyer tried to avoid its obligation to close.[150] The trial record here revealed virtually

---

[147] Agt. § 9.1(f).

[148] *Id.*

[149] *Id.* § 9.1.

[150] *See, e.g.*, *Desktop Metal, Inc. v. Nano Dimension Ltd.*, 2025 WL 904521, at *25 (Del. Ch. Mar. 24, 2025) (finding the defendants "stopped attempting to obtain CFIUS approval and started obstructing it"); *Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *12 (Del. Ch. Apr. 30, 2021) (finding the defendants deliberately "set on a course of conduct predestined to derail [d]ebt [f]inancing and supply a basis for terminating the agreements"); *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *4, *97, *118 (Del. Ch. Aug. 31, 2020) (finding the defendant took actions intended to undermine the merger, including "intentionally" testifying in a manner to help the DOJ block the deal and conducting a "covert" anti-merger communications campaign), *aff'd*, 251 A.3d 1015 (Del. 2021) (TABLE); *Channel Medsystems*, 2019 WL 6896462, at *38 (finding the defendant was "looking for a way out of its deal"); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*,

37

no evidence suggesting that Verisk intended to scuttle the deal. Verisk witnesses credibly testified that but for the uncertainty and cost presented by a lengthy Second Request process, AccuLynx remained an attractive acquisition target for Verisk, and no contemporaneous evidence suggests otherwise.[151] Verisk tried in earnest to convince the FTC that its "market reset" theory was unfounded and that it should not issue the Second Request,[152] and once issued, that the FTC should find the Second Request satisfied based on information produced under the quick look agreement.[153] Verisk met with the FTC nearly 30 times; hired experienced legal advisors, expert economists, and a government affairs firm to advocate for FTC

---

965 A.2d 715, 749 (Del. Ch. 2008) (finding the defendant "pursued [a] path designed to *avoid* the consummation" of deal financing).

[151] *See, e.g.*, Tr. (Shavel) at 326:3–9 ("[W]e believed that the merits of the transaction, the strength of the underlying business, was a compelling reason for us to pursue the transaction."); *id.* at 338:5–19 ("Based upon our experience and advice from counsel, from bankers, from colleagues that have had experience with the full review, the significant amount of time—which we had been advised could take 18 to 24 months—subjected us to a level of risk in terms of the ongoing performance of the business, the uncertainty of the closing of the transaction, significant financing costs, legal costs, advisory costs in responding to that, that we felt breached the threshold of economic merit where we felt that that risk was no longer justified by . . . the original merits of the transaction that we had assumed we would be able to close on a much faster timetable.").

[152] Tr. (Asker) at 134:11–15 ("It was an unusual theory."); JX 454 at 2 ("[W]e respectfully submit that the described theory of harm is not supported by case law or prior merger challenges (successful or unsuccessful) by the Commission, the Antitrust Division, or State Attorneys General."); JX 405 at 2 ("Empirical evidence does not support this theory.").

[153] *See supra* note 130.

clearance; and spent nearly $8 million in legal fees to review roughly four million documents from 16 custodians under the quick look agreement.[154]

Moreover, although Verisk misrepresented and omitted information in response to FTC questions by failing to disclose Verisk's discussions with ServiceTitan about an Enhanced Integration, its missteps were not intentional.[155] Verisk employees with knowledge of the Enhanced Integration and the August 5 Termination Email—primarily Brunko and Chen—testified at trial that they did not understand at the time that these discussions were responsive to the FTC's inquiries.[156] It is admittedly confounding that the same sophisticated businesspeople who decided in August to terminate discussions with ServiceTitan about the Enhanced Integration due to the Merger somehow did not recall or appreciate the significance of those events when the FTC asked about them weeks later throughout September and October. But the record does not support a finding that Brunko or Chen intentionally misrepresented or withheld information from the FTC.

Given the lack of evidence that Verisk intentionally botched the FTC approval process, AccuLynx does not argue that Verisk's "knowing and willful breach" of the

---

[154] *See supra* notes 132–33.

[155] *See, e.g.*, Tr. (Brunko) at 223:5–17, 224:2–8; *id.* (Chen) at 369:17–24, 370:6–16; JX 650 at 1–2.

[156] *See* Tr. (Brunko) at 223:5–17, 224:2–8; *id.* (Chen) at 369:17–24.

Merger Agreement prevented termination under Section 9.1(f). Instead, AccuLynx contends that both exceptions in the final sentence of Section 9.1 apply: (1) Verisk materially breached its commercially reasonable efforts obligations, and (2) Verisk's failure to fulfill its commercially reasonable efforts obligations, or its other "willful conduct," was the "primary cause" of the failure of a closing condition.

### 1. Commercially Reasonable Efforts

Two of AccuLynx's three arguments are based on Verisk's purported breach of its commercially reasonable efforts obligations. AccuLynx argues that (1) when Verisk purported to terminate, it was in material breach of its obligations under Section 6.1 to use commercially reasonable efforts to take all actions necessary to consummate the Merger and to obtain an early termination of any applicable waiting period under the HSR Act, and (2) Verisk's failure to comply with its commercially reasonable efforts obligations was the "primary cause" of the FTC's decision to deliver the Second Request instead of permitting the HSR waiting period to expire before the Termination Date. Although the parties directed much of their focus during post-trial oral argument to Verisk's commercially reasonable efforts obligations, this theory is an awkward fit for the facts of this case.

"When evaluating whether a merger partner has used reasonable best efforts, this court has looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its

counterparty." *Akorn*, 2018 WL 4719347, at *91. Commercially reasonable efforts obligations require parties "to take all reasonable steps to solve problems and consummate the transaction." *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017). Again, AccuLynx does not argue that Verisk "pursued another path designed to avoid" closing. *Hexion*, 965 A.2d at 749. And it does not argue that Verisk failed to "s[eek] to address problems with its counterparty." *Menn v. ConMed Corp.*, 2022 WL 2387802, at *36 (Del. Ch. June 30, 2022) (quoting *Snow Phipps*, 2021 WL 1714202, at *41). Instead, AccuLynx argues that Verisk breached its commercially reasonable efforts obligations by misrepresenting and omitting information about the Enhanced Integration with ServiceTitan in response to the FTC's questions. But the Verisk employees who knew about the Enhanced Integration, including Brunko and Chen, did not remember those discussions or understand they were responsive to the FTC's inquiries. Struggling to identify what efforts Verisk should have undertaken to ensure forgetful or confused employees accurately responded to the FTC's inquiries, AccuLynx suggests Verisk should have asked the right people[157] or conducted a

---

[157] OB at 19 (arguing that "Verisk never asked Love if he was aware of any request as described by the FTC"); *id.* at 44 ("Love oversaw integrations for Verisk, but nobody asked him the FTC's October 14 question.").

more comprehensive document search.[158]   Aside from second-guessing Verisk's

review efforts, AccuLynx's position largely rests on the questionable premise that

sophisticated parties just need to "do better" when they respond to regulatory

authorities.[159]

I need not definitively decide whether Verisk breached its commercially

reasonable efforts obligations, however, because another basis for challenging

Verisk's termination carries the day: Verisk's "willful conduct" was the "primary

cause" of the failure of a closing condition.

### 2. Verisk's Willful Conduct Was The Primary Cause Of The Failure Of A Closing Condition, Foreclosing Termination.

AccuLynx argues that Verisk was not permitted to terminate the Merger

Agreement because its "willful conduct" was the "primary cause" of the failure of a

closing condition.[160]   To recap, the final sentence of Section 9.1 forecloses

---

[158] *Id.* at 17–20, 44–45.

[159] *See* Oral Arg. Tr. at 27:17–20 ("[W]e expect, and Delaware law expects, better from a very sophisticated buyer and counsel under the circumstance to come forward and know that information."); *id.* at 29:12–13 ("[U]nder CRE, you have got to do better.  Deal certainty requires better.").

[160] As a threshold matter, Verisk asserts that AccuLynx waived this argument by failing to raise it before pre-trial briefing.  Verisk's primary support for this position is *Snow Phipps*, where the Court stated that "[t]he doctrine of waiver likely supplie[d] an adequate basis to hold [the buyer] to [a] previous representation" that conflicted with a new argument raised at trial.  2021 WL 1714202, at *44.  Here, AccuLynx's argument does not conflict with any prior representation, and is instead entirely consistent with its earlier filings, including

42

termination if the terminating party's "failure to fulfill its obligations or to comply with its covenants under this Agreement, or *other willful conduct*, *has been the primary cause of*, or primarily resulted in, *the failure to satisfy any condition* to the obligations of the Parties hereunder."[161]  AccuLynx argues that Verisk's "willful conduct" was the "primary cause" of the FTC's decision to deliver the Second Request, which prevented the HSR waiting period from expiring before the Termination Date.

Below, I consider the meanings of "willful conduct" and "primary cause" before applying those terms to the facts of this case.

### a. "Willful Conduct"

The parties offer different views on what makes conduct "willful."  AccuLynx argues that "willful conduct" is any conduct that is "[d]one wittingly or on purpose, as opposed to accidentally or casually; voluntary and intentional, but not necessarily malicious."[162]  Verisk, on the other hand, argues that "willful conduct" "connotes blameworthiness."[163]  Verisk points out that Black's Law Dictionary recognizes two

---

its answer and counterclaim, which cited both the August 5 Termination Email and the circumstances under which termination is unavailable under Section 9.1, including where "willful conduct" "has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of the parties hereunder."  Countercls. ¶¶ 56, 102.

[161] Agt. § 9.1 (emphasis added).

[162] OB at 32 (citing *Willful*, Black's Law Dictionary (12th ed. 2024)).

[163] AB at 43.

uses of "willful"—one that is "not necessarily malicious" and another that "is traditionally the equivalent of malicious, evil, or corrupt." *Willful*, Black's Law Dictionary (12th ed. 2024). Verisk prefers the latter usage, sometimes used in the criminal context, which Black's Law Dictionary supports by citation to Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 875–76 (3d ed. 1982):

> The word 'wilful' or 'wilfully' when used in the definition of a crime, it has been said time and again, means only intentionally or purposely as distinguished from accidentally or negligently and does not require any actual impropriety; while on the other hand it has been stated with equal repetition and insistence that the requirement added by such a word is not satisfied unless there is a bad purpose or evil intent.

*Id.* In the civil context, however, "willful" is more often used to mean "intentional, or knowing, or voluntary":

> Articulating an exact definition for "willful" in the legal context is a tricky task. Courts have described this term as a "word of many meanings whose construction is often dependent on the context in which it appears." The tremendous difficulty of pinpointing an exact definition for the term "willful" is what led Judge Learned Hand to call it "an awful word" that should be "purged" from any written index in which it is found. While defining the term "willful" can be a "slippery" endeavor, *courts generally agree that there is some distinction in the meaning of "willful" depending on whether it is used in the civil or criminal context*. The Supreme Court has noted that *in the civil context, willfulness draws the line between "intentional, or knowing, or voluntary" conduct from "accidental" conduct*. However, in the criminal context, willfulness draws the line between conduct that is done with "a bad purpose"—"the defendant acted with knowledge that his conduct was unlawful"—or "a culpable state of mind," and conduct which is not. In other words, in a criminal context, the defendant must have acted knowing that he was acting unlawfully.

44

Blake R. Bertagna, *Poaching Profits: An Examination of the Ability of a Trademark Owner to Recover an Infringer's Profits Under the Lanham Act as Amended in 1999*, 16 Tex. Intell. Prop. L.J. 257, 268–69 (2008) (emphasis added).[164]

What the Merger Agreement means by "willful conduct" here ultimately depends on context. Verisk says that "[i]n context with its surrounding terms, and the language of the express termination right, the phrase 'other willful conduct' is most naturally read to capture actions similar to—even if they are not quite—a breach or other contractual failure that caused an unsatisfied closing condition."[165] I disagree. If the parties wished to foreclose termination only when a "willful breach" or similar wrongful conduct caused the failure of a condition, they could have used that term in Section 9.1. The Merger Agreement uses the term "willful breach" elsewhere, including in Section 9.1(f), defined to mean "an intentional and willful material breach, or failure to perform any covenant or obligation, of this Agreement that is a consequence of an act or omission knowingly undertaken or omitted by the breaching party hereto with the intent of causing a breach of this

---

[164] In a similar vein, Verisk argues that "willfulness and wantonness involve an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences." *See* AB at 43 (citing *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987)). "Wanton" suggests indifference to the probable consequences of one's actions, *Wanton*, Black's Law Dictionary (12th ed. 2024), but the Merger Agreement does not pair "willful conduct" with "wantonness."

[165] AB at 44. Verisk cannot explain what it means to be "similar to" but "not quite" a breach, or how the Court could possibly apply such a standard. Oral Arg. Tr. at 102:4–18.

Agreement."[166] "Willful conduct" is not defined, but the parties intended it to mean something other than "willful breach." *See Benchmark Invs. LLC v. Pacer Advisors, Inc.*, 2026 WL 1179508, at *5 (Del. Apr. 30, 2026) ("[T]he use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings."); *see also PJT Hldgs., LLC v. Costanzo*, 339 A.3d 1231, 1251 (Del. Ch. 2025) (explaining that "willful breach" was "not addressing willful conduct generally," but meant something different, namely that "the counterparty knows that its conduct would constitute a breach").

This Court has explained that when parties fail to contractually define "willful breach," courts sometimes apply inconsistent standards for "what has to be willful." *XRI Inv. Hldgs. LLC v. Holifield*, 2024 WL 3517630, at *21 (Del. Ch. July 24, 2024). Under one view, a party "need only have *taken action knowingly and intentionally*." *Id.* (emphasis added). That is essentially what AccuLynx argues is required to demonstrate "willful conduct" here. Under stricter views, a party either "must have known that [its] conduct would constitute a breach and have acted purposefully to breach the contract" or "must have specifically intended to harm the counterparty such that the breach constitutes an intentional tort." *Id.*

---

[166] Agt. § 9.2(c).

In *XRI*, the Court interpreted a limited liability company agreement that foreclosed indemnification for "gross negligence or willful breach" of the agreement. By juxtaposing "willful breach" with gross negligence, the parties intended "willful breach" to mean something more than "*willful conduct in the sense of voluntary action*." *Id.* (emphasis added). In that case, "willful breach" instead "ratchet[ed] the required mental state up one level by requiring that the counterparty both have acted intentionally and known that its action would cause a breach." *Id.* The inverse is true here. The structure of the Merger Agreement demonstrates that the parties intended "willful conduct" to require less than "willful breach." By juxtaposing "knowing and willful breach" in Section 9.1(f) with "willful conduct" in the last sentence of Section 9.1, the Merger Agreement ratchets *down* the required mental state, prohibiting termination not only when a terminating party has intentionally breached the Merger Agreement, but also when the party has engaged in any voluntary and intentional conduct that caused a condition to fail.

### b. "The Primary Cause"

I next consider what it means for conduct to "ha[ve] been the primary cause of, or primarily resulted in, the failure to satisfy [a] condition."[167] The parties'

---

[167] Agt. § 9.1.

briefing does not discuss the meaning of "primary cause," despite their request that I apply the term to evaluate Verisk's purported termination.

Under Section 9.1(f), Verisk is not "entitled to terminate . . . if [its] knowing and willful breach of this Agreement has prevented the satisfaction of the conditions to the consummation of the Transactions."[168] This language tracks the common law prevention doctrine, under which "a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent." *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985). "[T]he [prevention] doctrine is based on the long-established principle of law that a party should not be able to take advantage of its own wrongful act." *De Los Santos v. Allstate Prop. & Cas. Ins. Co.*, 345 A.3d 959, 959 n.54 (Del. 2025) (TABLE). When the prevention doctrine is invoked, "it is not necessary to show that [the condition] would have occurred but for the lack of cooperation." Restatement (Second) of Contracts § 245 (1981). "It is only required that the breach have *contributed materially* to the non-occurrence." *Id.* (emphasis added).

The language of Section 9.1 on which AccuLynx relies here differs from Section 9.1(f) and the prevention doctrine in two ways. First, as highlighted above,

---

[168] *Id.* § 9.1(f).

48

it applies when a party has engaged in "willful conduct" rather than a "knowing and willful breach." And second, it applies when such conduct has been "the primary cause of, or primarily resulted in, the failure to satisfy"—instead of "prevented"—the condition.[169] While Section 9.1 decreases the required mental state from "knowing and willful breach" to "willful conduct," it increases the required showing for causation from "contribut[ing] materially" under the prevention doctrine to being the "primary cause of" the failed condition.

Delaware "embraces a 'but for' causation paradigm where proximate cause exists when an act or omission 'in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.'" *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *13 (Del. Ch. Sep. 22, 2016) (quoting *Duphily v. Del. Elec. Co-op, Inc.*, 662 A.2d 821, 829 (Del. 1995)); *see also Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 609 (Del. Ch. 2010) ("In Delaware, proximate cause is 'that direct cause without which the [incident] would not have happened.'" (quoting *Finocchiaro v. D.P., Inc.*, 2006 WL 3873257, at *6 (Del. Super. Dec. 29, 2006))). "An intervening cause only breaks the chain of causation when it is a superseding cause, an act or event, itself a proximate cause of the injury, that could not have been

---

[169] Agt. § 9.1 (emphasis added).

anticipated or reasonably foreseen by the original tortfeasor." *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *17 (Del. Ch. Oct. 31, 2012).

Generally, under Delaware law, "there may be more than one proximate cause of [a] plaintiff's injury." *Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000). Under Section 9.1, to foreclose termination, Verisk's conduct must have been the *primary* cause of the failed condition.

### c. Verisk's Willful Conduct Was The Primary Cause Of The Second Request, Which Prevented The HSR Waiting Period From Expiring Before The Termination Date.

AccuLynx argues that Verisk's willful conduct was the primary cause of the FTC's insistence on compliance with the Second Request, which prevented the HSR waiting period from expiring before the Termination Date. At trial, AccuLynx proved by a preponderance of the evidence that the FTC would not have required full compliance with the Second Request but for Verisk sending the August 5 Termination Email, prompting the FTC's "market reset" theory.[170]

---

[170] During post-trial oral argument, AccuLynx conceded that it bears the burden to prove causation. Oral Arg. Tr. at 33:19–20. I note that under the prevention doctrine, once a party invoking the doctrine shows that a breach contributed materially to the non-occurrence of a condition, the breaching party bears the burden to prove "that the condition would not have occurred regardless of the lack of cooperation." Restatement (Second) of Contracts § 245 (1981). Similarly, in tort, once a plaintiff has proven proximate cause, the defendant bears the burden to establish a superseding cause. 65A C.J.S. Negligence § 778. I have nevertheless accepted the parties' arguments and assumed that only AccuLynx bears the burden to prove causation.

AccuLynx and Verisk believed when they signed the Merger Agreement that the Merger presented minimal antitrust risk. Verisk and AccuLynx did not compete horizontally, they did not have a vertical supplier-customer relationship, and Verisk had integration agreements with only a small number of AccuLynx competitors.[171] The parties agreed to a four- to five-month outside closing date on the belief that the Merger presented little regulatory risk.[172]

Five days before the Merger Agreement was signed, however, Verisk employees, including senior officers with antitrust experience,[173] decided that after the Merger was announced, Verisk should stop discussions with ServiceTitan about an Enhanced Integration, noting "[t]here may be reserved capability . . . for [AccuLynx] only."[174] One week after the Merger Agreement was signed, Love implemented that decision by sending the August 5 Termination Email in which Verisk ended Enhanced Integration discussions with ServiceTitan, identifying the Merger as the reason:

> Now that the [AccuLynx] acquisition has been announced publicly, more information has been coming to [another colleague] and me. Considering this new information, we will not be able to continue down

---

[171] Tr. (Asker) at 13:15–14:12, 16:10–20 (explaining that these factors were "encouraging that there would not be significant antitrust issues arising from the deal").

[172] *See supra* note 35 and accompanying text.

[173] Notably, Chen worked on 100 to 200 deals at J.P. Morgan before joining Verisk and handled between 10 and 20 HSR submissions while at Verisk. *See* RB at 6.

[174] JX 200 at 1.

the path of placing Xactimate's pricing data directly into ServiceTitan's estimating solution.[175]

Although Verisk decided to end discussions with ServiceTitan before signing,[176] it implemented that decision by sending the August 5 Termination Email seven days after the Merger Agreement was signed.[177]

The FTC opened a preliminary investigation into the Merger on August 26.[178] On September 5, the same day the FTC met with the parties to learn more about Verisk's claims estimation business, FTC staff attorney Ashley Masters spoke with Olive Huang at ServiceTitan, who told her that prior to the Merger, Verisk and ServiceTitan had been negotiating an Enhanced Integration, but after the announcement of the Merger, Verisk "changed their minds" and ended the discussions.[179] This prompted the FTC to ask Verisk how "potential integration of [AccuLynx] with Xactware post-merger" would "differ, if at all, from any current

---

[175] JX 246 at 2.

[176] *See* AB at 2, 42 (arguing that Verisk could not have breached the Merger Agreement before it was signed).

[177] Verisk argues that it did not know the August 5 Termination Email would attract FTC scrutiny, but that does not change the analysis. Terminating discussions was willful—*i.e.*, voluntary and intentional—conduct, even if doing so was not wrongful and Verisk did not expect its decision would raise competition concerns.

[178] PTO ¶ 49; Tr. (Asker) at 18:18–19:1; *id.* (Antoine) at 632:21–633:3.

[179] Tr. (Huang) at 481:21–482:2 ("So we did say that we had been pursuing a more bespoke integration with Verisk and they changed their minds on pursuing that bespoke integration after the transaction was announced.").

or planned . . . integrations Xactware has with companies that Verisk or AccuLynx has identified as rivals to AccuLynx," referencing "existing integrations of XactAnalysis with [Salesforce] and JobNimbus and *planned integrations of Xactimate with* Roofr and *ServiceTitan*."[180]

At meetings on September 10 and 11, the FTC explained that it was exploring four theories of competitive harm.[181] Just days later, Masters spoke again with Huang, who conveyed to Masters the contents of the August 5 Termination Email.[182] Throughout the remainder of September and early October, the FTC repeatedly asked Verisk whether it had terminated discussions of integrations, knowing that Verisk sent ServiceTitan the August 5 Termination Email.[183]

By September 26, the FTC had narrowed its four theories of competitive harm to one: a "market reset" theory centering on Verisk's plans to integrate with AccuLynx competitors after the Merger.[184] The parties agree that this theory was unusual, unsupported by any real-world examples or empirical evidence, and likely

---

[180] JX 331 (emphasis added).

[181] *See supra* pp. 15–16.

[182] Tr. (Huang) at 484:21–486:9.

[183] *See, e.g.*, JX 331 at 3; JX 374 at 2; Tr. (Asker) at 57:15–58:2, 144:4–18.

[184] JX 405 at 2; JX 885; Tr. (Asker) at 35:19–36:17.

would not have provided a basis to stop the deal.[185]  But one specific event—Verisk's August 5 Termination Email—provided the FTC with tangible evidence that its concerns were more than theoretical.  More likely than not, but for the August 5 Termination Email, the FTC would not have been seriously concerned about a potential "market reset."

Indeed, Verisk's own regulatory expert, former Director of the Bureau of Competition, Holly Vedova, opined at trial that the August 5 Termination Email was "the reason why the FTC needed to investigate."[186]  The FTC's narrowed focus on Verisk's integrations (including terminated integrations) with AccuLynx competitors makes that clear.  For instance, at an October 14 meeting, the FTC asked Verisk three times in three different ways "whether any competitors of AccuLynx had approached Verisk to request an integration with Xactware that is more sophisticated or materially different than the integration that is currently available

---

[185] Tr. (Asker) at 134:11–15 ("It was an unusual theory."); JX 454 at 2 ("[W]e respectfully submit that the described theory of harm is not supported by case law or prior merger challenges (successful or unsuccessful) by the Commission, the Antitrust Division, or State Attorneys General."); JX 405 at 2 ("Empirical evidence does not support this theory.").

[186] Tr. (Vedova) at 432:9–15; *see* Pls./Countercl. Defs. Verisk Analytics, Inc. and Lenny Merger Sub, Inc.'s Pretrial Br. at 45, Dkt. 225.  Verisk's CEO also told its board of directors that the FTC's decision to require full compliance with the Second Request was "based on concerns expressed by other market participants on the impact of the transaction."  JX 709; Tr. (Shavel) at 331:6–332:8.  The FTC's chief concern came from ServiceTitan after the August 5 Termination Email.

with JobNimbus, and whether Verisk ha[d] rejected such offer."[187] The FTC already knew the answer and asked ServiceTitan later that day to provide a copy of the August 5 Termination Email.[188] The following week, FTC Chairman Andrew Ferguson told AccuLynx's lobbyist that "customers and competitors [we]re telling the FTC that . . . Verisk will use Xactimate to foreclose competition from AccuLynx's competitors"[189] and that "a competitor told [the] FTC that they were about to integrate Xactimate with Verisk pre-transaction, and Verisk cut the discussions because of this deal."[190] The competitor was ServiceTitan, and its complaints arose from the August 5 Termination Email. The FTC issued the Second Request the same day.[191]

Verisk's failure to produce the August 5 Termination Email exacerbated the FTC's concerns. Verisk's omissions may not qualify as "willful conduct"—again, the evidence does not support a finding that Verisk intentionally withheld information from the FTC[192]—but its inaccurate responses to integration questions

---

[187] Tr. (Asker) at 144:4–18, 57:15–58:2.

[188] JX 493 at 1; Tr. (Huang) at 489:14–491:1.

[189] JX 538 at 2.

[190] *Id.*; *see also* JX 709; Tr. (Shavel) at 331:6–332:10.

[191] PTO ¶ 51; Tr. (Asker) at 74:17–19.

[192] *See supra* pp. 23–24.

compounded the concerns raised by the August 5 Termination Email. And, but for the August 5 Termination Email, there would have been nothing to disclose.

Verisk asserts that the August 5 Termination Email was not the "primary" cause of the FTC's decision to issue the Second Request, suggesting the FTC had other "substantive concerns from the outset of its review—based on information from the parties, information from multiple third-party sources (not just ServiceTitan), and the FTC's own, independent judgment."[193] Yet ServiceTitan was the only AccuLynx competitor who had numerous calls with the FTC, the only competitor that received a subpoena, and the only competitor with whom the FTC engaged on critical dates throughout the process.[194] More likely than not, the August 5 Termination Email was the primary cause of the FTC's concerns, which led it to insist on full compliance with the Second Request.

AccuLynx met its burden to prove that the August 5 Termination Email was the primary cause of the Second Request, which prevented the HSR waiting period from expiring before the Termination Date. Under Section 9.1, Verisk's purported termination of the Merger Agreement was therefore invalid.

---

[193] AB at 45.

[194] *See* Tr. (Vedova) at 431:23–432:8.

## B. Remedies

Having proven that Verisk's termination of the Merger Agreement was improper, AccuLynx seeks an order of specific performance and damages for "direct costs," with prejudgment interest. It is entitled to both.

### 1. AccuLynx Is Entitled To An Award Of Specific Performance.

As set forth above, Verisk's termination of the Merger Agreement was invalid under Section 9.1 because its willful conduct caused the failure of a condition to closing. AccuLynx seeks an order of specific performance requiring Verisk to perform its obligations under the still-effective Merger Agreement, including by using commercially reasonable efforts to obtain clearance required under the HSR Act and to close the Merger "if and when" the FTC approves the transaction.

"A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance." *Osborn*, 991 A.2d at 1158. AccuLynx "bears the burden of proving that it is entitled to specific performance by clear and convincing evidence." *Channel Medsystems*, 2019 WL 6896462, at *39.

First, on the existence of a valid contract, I found above that Verisk's purported termination of the Merger Agreement was invalid.

Second, AccuLynx stands ready, willing, and able to perform. Verisk does not contend that AccuLynx cannot perform under the Merger Agreement, but it

57

asserts that AccuLynx is not entitled to specific performance because it breached the Merger Agreement's exclusivity provision after Verisk's invalid termination.[195] "Specific performance will not be granted to a party who is in default of a *material* obligation under the contract, unless that party is excused from performance of that obligation." *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *6 (Del. Ch. Nov. 14, 2022) (emphasis added). "A breach is material if it goes 'to the root or essence of the agreement between the parties,' or 'touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017) (quoting *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015)). Verisk makes no effort to demonstrate or even argue that AccuLynx's breach of the exclusivity provision was material, such that Verisk's performance should be excused. Indeed, any such breach was immaterial. AccuLynx's breach after Verisk's purported termination did not deprive Verisk of the benefit of its bargain or cause it harm. AccuLynx stands ready to perform under the Merger Agreement.

Third, clear and convincing evidence demonstrates that the equities weigh in AccuLynx's favor. AccuLynx bears no blame in the course of events that led to

---

[195] AB at 55.

Verisk's purported termination, while it was Verisk's conduct that caused the FTC to issue and insist on compliance with a Second Request that prolonged the regulatory approval process beyond the Termination Date. Verisk argues that it would be inequitable to order specific performance where "there is no evidence of any bad faith or intentional misconduct on the part of Verisk."[196] But the parties specifically agreed in the Merger Agreement that a party could not terminate if its own "willful conduct" was the "primary cause" of the failure to satisfy a condition. It is not inequitable to hold the parties to their bargain.

Verisk raises three final arguments in opposition to an order of specific performance. Verisk argues that "specific performance is not available if damages would provide adequate relief."[197] But "[t]his court has not hesitated to order specific performance in cases of this nature, particularly where sophisticated parties represented by sophisticated counsel [have] stipulate[d] that specific performance would be an appropriate remedy in the event of breach." *Snow Phipps*, 2021 WL 1714202, at *51 (citing *Channel Medsystems*, 2019 WL 6896462, at *39; *Hexion*, 965 A.2d at 763; and *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 84 (Del. Ch. 2001)). The parties so stipulated here:

---

[196] Oral Arg. Tr. at 85:7–8.

[197] AB at 55.

The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that any breach of this Agreement would not be adequately compensated in all cases by monetary damages alone. . . . Furthermore, each Buyer Party agrees that each of the Seller Representative and the Company shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the obligations of the Buyer Parties hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief. Each party hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by such party, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such party under this Agreement all in accordance with the terms of this Section 11.12.[198]

"Although th[e] [irreparable harm] provision does not tie the court's hands in fashioning appropriate equitable relief, it reflects the parties' understanding that specific performance would be available in this circumstance, which is entirely consistent with past Delaware cases granting specific performance for failure to perform under a merger agreement." *Channel Medsystems*, 2019 WL 6896462, at *39 (citing *IBP*, 789 A.2d at 84; and *Hexion*, 965 A.2d at 762).

Verisk also argues that an order of specific performance is inappropriate because AccuLynx failed "to preserve the status quo."[199] Verisk points to no

---

[198] Agt. § 11.12.

[199] AB at 55.

evidence in the record showing how the status quo has been altered, nor has it claimed that AccuLynx breached an interim operating covenant. Verisk also never moved for entry of a status quo order, notwithstanding that AccuLynx has sought specific performance since filing its counterclaims and seeking expedition.[200]

Finally, Verisk contends that an order of specific performance would be "unworkable, given the complexity and difficulty of judicial oversight."[201] The Court has ordered specific performance of efforts clauses in other similar cases. *See Desktop Metal*, 2025 WL 904521, at *44–45 (ordering specific performance of obligation to use reasonable best efforts to consummate a merger); *Snow Phipps*, 2021 WL 1714202, at *55 (ordering "specific performance of [a party's] obligation to use reasonable best efforts to obtain alternative financing"); *Channel Medsystems*, 2019 WL 6896462, at *44 (ordering specific performance where a party "breached its obligation to use commercially reasonable efforts to consummate the merger"); *Hexion*, 965 A.2d at 762–63 (ordering specific performance of covenant to use reasonable best efforts to consummate financing for the merger). "[W]here, as here, the parties contracted for specific performance, Delaware courts will enforce their bargain unless the breaching party presents a 'persuasive' and

---

[200] *See* Countercls. ¶¶ 98, 104, 110.

[201] AB at 54.

'case-specific' reason not to." *Fortis Advisors, LLC v. Krafton, Inc.*, 354 A.3d 906, 948 (Del. Ch. 2026). Verisk has not identified any case-specific factors that militate against specific performance.

AccuLynx has demonstrated that it is entitled to an award of specific performance requiring Verisk to perform under the Merger Agreement, including by using commercially reasonable efforts to obtain clearance required under the HSR Act and to close the Merger if the FTC approves the transaction.

## 2. AccuLynx Is Entitled To Damages For Direct Costs And Prejudgment Interest.

AccuLynx also seeks a damages award of "direct costs" in the amount of $3.85 million, plus prejudgment interest.

"An order of specific performance . . . will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice so requires." *Snow Phipps*, 2021 WL 1714202, at *55 (quoting Restatement (Second) of Contracts § 358(1)). "[A]n order of specific performance 'seldom results in performance within the time the contract requires.'" *Id.* (quoting Restatement (Second) of Contracts § 358 cmt. c). "To that end, 'damages for the delay will usually be appropriate.'" *Id.* (quoting Restatement (Second) of Contracts § 358 cmt. c).

AccuLynx sought an award of $3.85 million, plus prejudgment interest, in its post-trial opening brief.[202]  Verisk failed to respond to this request in its post-trial answering brief.  Any opposition is therefore waived.  *See Capano v. Capano*, 2014 WL 2964071, at *16 (Del. Ch. June 30, 2014) (holding that a party conceded issues by failing to respond to arguments in its answering brief or at oral argument).

## III.   CONCLUSION

For the foregoing reasons, judgment is entered for Defendants/Counterclaim-Plaintiffs on their counterclaim for specific performance of the Merger Agreement, direct costs, and prejudgment interest.  The parties are directed to submit a proposed form of final order to implement the rulings herein.

---

[202] OB at 57.